198 So.2d 619

### Charlie V. HORTON

v.

### MOBILE CAB AND BAGGAGE COMPANY et al.

1 Div. 355.

Supreme Court of Alabama.

April 13, 1967.

Inge, Twitty, Duffy & Prince, Mobile, for appellee Mobile Cab & Baggage Co.

Donald F. Pierce, C. Wayne Loudermilch and Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for appellee Kelley.

HARWOOD, Justice.

Verdict and judgment was in favor of the defendants below (appellees here) and the plaintiff, his motion for a new trial being overruled, perfected an appeal to this court.

The appellant, Charlie V. Horton, was riding as a passenger in a taxicab operated by the Mobile Cab and Baggage Company. About 12:15 P.M., during a rain, the cab collided with an automobile driven by Albert L. Kelley. The collision occurred at the intersection of Joachim and Government Streets in Mobile.

Diamond & Lattof, Mobile, for appellant.

The cab, proceeding south on Joachim had stopped at the traffic light and according to appellant's evidence, did not move into the intersection until the light turned green in favor of the cab.

Kelley testified he had observed the traffic light as he drove west on Government Street and entered the intersection on a green light. Moore, the driver of the cab, testified that a car in the left lane of Joachim Street blocked his vision of Government Street, and he did not see the Kelley automobile until it was right in front of him.

The right front portion of the cab struck the right rear fender of the Kelley car. The Kelley car proceeded about two car lengths after the collision, and the cab, travelling about five miles per hour, stopped almost immediately upon the impact.

The Kelley car received a dent in the rear right fender, which Kelley described as minor. The damage to the cab consisted of a broken right headlight. Both vehicles could be driven after the collision.

Moore, the cab driver, testified by deposition that he was not hurt in the collision, and that the appellant, who was riding on the front seat with him, was not thrown from the seat; that after the collision the appellant offered to remain at the scene but he told him that the police would be there soon and investigate, and urged the appellant to go on to his nearby hotel.

Later that day, Moore went to appellant's hotel room to obtain a statement from the appellant. In this connection the record shows the following:

"A He" (appellant) "said, 'No, it wasn't your fault.' He said, 'We should sue them both and get some money.' I said, 'No, I don't need no money that way.' I said, I'll probably get fired if you sue the company anyhow.' I said, 'How about just signing this and forgetting about it.' I said, 'You're not hurt, are you? If you're hurt then don't sign it,'

and he said, 'No, I'm not hurt,' and then he signed the statement that he wasn't hurt.

"Q Did you make him sign the statement?

"A I didn't make him sign the statement, no, sir.

"Q You didn't promise him any reward?

"A No, sir, there was another seaman in there with him.

"Q You didn't promise him any reward or anything?

"A I didn't promise him anything. They was having a drink and he invited me to have a drink with them. I was off and wasn't working or anything so I had a drink with them, with him and the other seaman in there."

The appellant testified in his own behalf that he was a seaman, and was in Mobile by virtue of his ship docking there. On the day of the accident he had had a couple of farewell drinks with other seamen, then got a taxi to go to the Admiral Semmes Hotel. The collision occurred on this trip. The appellant testified that when the cab and the Kelley car collided he either went into the door or dashboard of the cab, and was hurt about two inches above the right hip, and on the side and back. After the collision, he paid the driver and gave him his hotel room number. He felt a little "shook up" at the time but did not consider his injuries too bad. He went to his hotel room, laid down for a while, and then went to the Union Hall, applied for his vacation pay, then returned to his hotel. Later that day Moore, the cab driver, came to his hotel room and after discussion the appellant signed a statement of "some kind."

Later that day he was feeling worse and finding an express bus was leaving very soon for Norfolk, Virginia, his home, he boarded the bus around 9:15 P.M. About 28 hours later he arrived in Norfolk but had to have a cab driver take his gear

off the bus for him. He went to his home and the next day he could not get up because of his hurts, and his wife put hot packs on him. About five days later he went to the Public Health Service in Norfolk and they prescribed heat treatments and exercise for him. Failing to get relief with this treatment, he went to see Dr. Fekete on 14 March 1964. On 10 June 1964, he shipped out and was on this voyage about two months. He was able to do routine work which was light, but suffered pain when he tried to do heavy work. He went to a doctor at the port in Maine in which his ship was docked, and this doctor found him unfit for duty and he was sent to the Public Health Service in New York. He was treated there for about two weeks and then came home. Feeling better, he again shipped out about 23 September 1964, on another ship, but after about two months he got to hurting again so he left the ship in Canada and flew to his home in Norfolk.

After a short while he began to feel better and again shipped out on 28 September 1964. His condition worsened on this voyage and he saw a doctor in Pakistan who gave him some pain medicine. He left this last ship around the last of March and reported to the Public Health Service Hospital in Norfolk where he remained for about five weeks. During this time he was given traction and heat treatments and pain shots, and after leaving the hospital was treated in the out-patient service. His condition not improving he went to see Dr. Levy in Norfolk and was under his care for about three months.

Upon being released by Dr. Levy, the appellant again shipped out but has worked only periodically ever since. The appellant testified that he still has considerable pain around the side of his head and numbness in the left hand and fingers, and a weakness in his left arm so that he is unable to do heavy work.

The appellant further testified as to his earnings in prior years as a seaman, and as to the medical expenses he had incurred

in his treatments. He stated that he was 58 years of age and had worked as a seaman since 1951. Previous to the accident he had never had any trouble with that part of his back and spine injured in the accident, and up to that time he had been able to perform heavy work.

By deposition, Dr. Fekete testified that on the initial visit of the appellant to his office he found that the appellant had a marked degree of spasm in the muscles of his back, causing a good deal of immobility in the back in this area. He advised the appellant to continue the diathermy treatments he was receiving at the Public Health Service and gave him instructions in home physiotherapy. When the appellant failed to respond favorably, Dr. Fekete referred him to an orthopedic specialist for consultation. This specialist concurred in Dr. Fekete's treatment and in addition suggested sporadic injections of xylocaine. This brought about a favorable response and on 3 June 1964, Dr. Fekete declared the appellant fit for duty as a seaman.

On cross examination, Dr. Fekete testified to the effect that he had seen individuals with injuries similar to the appellant's who were unaware of their injuries immediately following the accident; that with some people this type of injury gave difficulty immediately; that a sprain can be a significant injury, just like a Charley Horse.

Dr. Levy testified that when he examined the appellant it was his opinion that the appellant had a partially herniated disc irritating the eighth nerve root, and X-rays tended to confirm his diagnosis.

It was Dr. Levy's further opinion, *based on the history related to him by the appellant,* that the herniated disc developed as a result of the automobile accident.

The appellant had a dramatic response to the treatment by Dr. Levy, and on 24 September 1964, he instructed appellant to attempt to return to work.

On the other hand, Dr. Lloyd W. Russell, who had examined the appellant about a week before the trial, testified that it was his opinion from X-ray studies, that the appellant was afflicted with hypertrophic or osteoarthritis with some bony spurs in the cervical spine, some lipping of the vertebra in the cervical spine, with a degenerative disc disease. Such condition takes a considerable number of years to develop, and is consistent with the appellant's symptoms. The condition which Dr. Russell found is consistent with the case where a person had never been in an accident.

Dr. Russell further testified that he would not expect the appellant to have received a serious injury in the accident since, according to the history given him by the appellant, his symptoms did not show up for about a year.

■ Assignment of error No. 5 asserts that the court erred in giving at the request of the appellee Kelley, the following written charge:

"10. The Court charges the jury that the Defendant Albert Kelley had the right to assume that the Yellow Cab would not enter Government Street until the driver had first ascertained that he could do so with reasonable safety."

Counsel for appellant argues that the charge assumes facts in dispute to be true and was therefore improper. The charge assumes no facts, but merely sets forth a legal principle for the guidance of the jury.

Counsel further argues that the charge is faulty in that the evidence shows that Kelley entered the intersection at a speed of 20 miles per hour, whereas Section 5, Title 36, Code of Alabama 1940, provides that the lawful speed when approaching within fifty feet of an intersection where a driver's view is obstructed is 15 miles per hour.

■■ The rate of speed of 15 miles per hour as established under the above code section is not a hard and fast rule, but only prima facie the lawful limit. Whether the speed at which one enters an intersection is lawful depends upon the conditions then existing. The question is one ordinarily for the jury, and is flexible to yield to the circumstances of each case. When the circumstances are shown, the question is one for determination of the jury from the evidence. Brownell-O'Hear Pontiac Co. v. Taylor, 269 Ala. 236, 112 So.2d 463, and cases cited therein.

■ The charge correctly stated a general legal principle. Karpeles v. City Ice Delivery Co., 198 Ala. 449, 73 So. 642; Pearson v. Fountain, 280 Ala. 1, 189 So.2d 551.

■ While Charge 10 may have possessed misleading tendencies because of absence of correlated principles, such as that the presumption does not prevail under all conditions, and the general duty to operate an automobile with prudent regard for the safety of others is not removed by the presence of traffic lights, yet such correlated principles do not destroy the validity of the general principle enunciated in the charge, and if the charge was misleading, such tendency should have been cured by requested explanatory charges. No merit attaches to Assignment of error No. 5.

Assignment of error No. 6 relates to the action of the lower court in refusing to permit the deposition of Dr. Fekete to go to the jury as an exhibit, the deposition having been read to the jury.

In this connection the record shows the following:

"Mr. Latoff: I want to first offer in evidence the deposition of Dr. Andrew M. Fekete. I'm going to ask Mr. Thigpen to take the stand while I read it."

The court then instructed the jury that the deposition was to be considered by them as evidence in the case along with the other evidence.

Thereupon Mr. Latoff read the questions in the deposition, with his associate, Mr. Thigpen, reading the answers.

At the conclusion of the reading of the deposition, Mr. Latoff stated, "We have already offered the deposition in evidence. I will get the Court Reporter to identify it at this time."

Opposing counsel then objected to the deposition itself going to the jury, it having been read to the jury.

The court sustained the objection to the deposition itself going to the jury.

In Lurie v. Kegan-Grace Co., 209 Ala. 339, 96 So. 344, objections to certain questions and answers in a deposition had been sustained. These objectionable parts were bracketed by pencil marks. Over objections, the court permitted the deposition to go to the jury, instructing the jury that the bracket portions were not be be considered. It was held that the court erred in permitting the deposition to go to the jury under these conditions. The court further observed:

"Whether a deposition or written showing for an absent witness, unaffected with inadmissible matter, should be taken out by the jury is subject to the discretion of the trial court."

To like effect see also Smith v. State, 142 Ala, 14, 39 So. 329; K. B. Koosa and Co. v. Warten, 158 Ala. 496, 48 So. 544; Davis v. Brandon, 200 Ala. 160, 75 So. 908; Alabama City G. & A. Ry. Co. v. Heald, 178 Ala. 636, 59 So. 461.

Counsel for appellant, however, contends that the following language in Accident Indemnity Ins. Co. v. Feely, 279 Ala. 74, 181 So.2d 889, demonstrates that the jury was entitled to receive the deposition as an exhibit:

"The deposition was taken as required by the statute and was a legal document, susceptible to have been read in whole or in part to the jury, and to be received in evidence."

In the above case the court had permitted the deposition, which was read in toto, to be taken out by the jury. This court merely held that such did not constitute reversible error the court having permitted the deposition to go to the jury. In other words, the court exercised its discretion in the matter, and no reversible error would be cast upon the ruling in the premises.

We note that the action of a trial court in permitting a deposition to go to a jury, even where no objectionable matter is contained therein, has been subjected to the criticism that such action might result in the evidence contained in the deposition being over-emphasized as compared with the oral testimony of the other witnesses. See Barron and Holtzoff, "Federal Practice and Procedure with Forms", Rules Edition, as Revised by Wright, Vol. 2A, p. 171.

We hold, however, that the question of permitting a deposition containing no objectionable matter to go to the jury is within the discretion of the trial court.

In the present instance no error resulted in the ruling of the lower court in refusing to let the deposition be taken out by the jury.

Assignment of error No. 7, involves the same point as does Assignment 6, supra, except that it relates to the action of the court in refusing to permit the deposition of Dr. Levy to be taken by the jury. What we have written above disposes of this assignment.

Assignments of error 1, 2, and 3, read:

"1. The verdict of the jury and judgment of the court are contrary to the undisputed evidence in the case.

"2. The verdict of the jury and judgment of the court are not sustained by the evidence.

"3. The verdict of the jury and judgment of the court are against the weight of the evidence."

**42**

These assignments are inadequate to invite our review in that they do not allege error by the trial court in any respect. King v. Jackson, 264 Ala. 339, 87 So.2d 623; Roan v. Smith, 272 Ala. 538, 133 So.2d 224; Vickers v. Vickers, 273 Ala. 645, 144 So.2d 8.

Assignment of error No. 4 alleges error in the action of the trial court in denying appellant's motion for a new trial.

In effect, counsel for appellant argue that since there was a collision there must have been negligence.

A showing of an unfortunate result does not in and of itself raise an inference of negligence. Watterson v. Conwell, 258 Ala. 180, 61 So.2d 690. The burden was upon the plaintiff, if he is to recover, to establish negligence to the reasonable satisfaction of the trier of fact. Under all the evidence it was within the province of the jury to find that injury to the plaintiff, if any, was the result of an unavoidable accident, in which case there would be no liability on the part of the defendant. See Johnson v. Louisville and Nashville R. R. Co., 240 Ala. 219, 198 So. 350.

Further, under the testimony of the cab driver, Moore, that he was uninjured by the collision, the apparent minor nature of the collision as evidenced by the damages to the two vehicles, the testimony of Dr. Russell as to the nature of appellant's condition, and the action of the appellant in giving a written statement to Moore after the accident that he had not been hurt, would justify the jury in concluding that the appellant's back condition was not the proximate result of the collision, but of a preexisting physical condition. This being so, the appellant was not entitled to recover.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.